Filed 4/13/26  In re St.M. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re St.M. et al., Persons Coming Under the Juvenile Court Law. | B346928 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. N.M., Defendant and Appellant. | Los Angeles County Super. Ct. Nos. 20CCJP05292E, 20CCJP05292F |

APPEAL from an order of the Superior Court of Los Angeles County, Craig S. Barnes, Judge.  Affirmed.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Jessica Buckelew, Deputy County Counsel, for Plaintiff and Respondent.

Mother challenges a juvenile court order terminating jurisdiction with a permanent plan of legal guardianship for her daughter St.M. (born December 2020) and her son A.M. (born November 2021). She contends the court abused its discretion by (a) summarily denying her petition to reinstate reunification services; and (b) imposing unworkable restrictions on her right to visitation under the legal guardianship. (See Welf. & Inst. Code, §§ 388, 362, subd. (a).)[1] We find no error and affirm.

## BACKGROUND

Mother has six children who were part of the underlying dependency proceedings: L.M. (born June 2014), S.M. (born December 2015), R.L. (born December 2016), K.M. (born February 2018), St.M. (born December 2020), and A.M. (born November 2021). This appeal concerns only St.M. and A.M. Father is the presumed father of L.M. and S.M. and the alleged father of K.M., St.M., and A.M.

In November 2020, the Los Angeles County Department of Children and Family Services (the Department) filed a dependency petition on behalf of L.M., S.M., R.L., and K.M. alleging mother failed to protect them from father's persistent physical violence against mother.[2] Before the juvenile court had adjudicated the petition, mother gave birth to St.M.

---

[1]  Statutory references are to the Welfare and Institutions Code.

[2]  The petition alleged mother allowed father to reside in the home with the children in violation of a criminal protective order issued in response to a series of violent assaults by father against mother in the older children's presence. Mother had also had a 2016 dependency case involving the older children, likewise

2

On February 1, 2021, the Department filed a dependency petition on behalf of St.M., alleging mother had failed to protect the infant's siblings from father's violence. (See § 300, subds. (b), (j).) The juvenile court detained St.M. from the parents' custody, and the Department placed her with the foster parent who would ultimately become St.M.'s legal guardian.

In advance of the jurisdiction and disposition hearing, the Department reported mother's behavior had been erratic and counterproductive. She made repeated false accusations against the children's caregivers, some of which included doctored text messages; she participated in counseling and other services, but denied that domestic violence threatened the children's safety; and she claimed not to have had any contact with father, but one of the older children reported seeing father nearby during a visit with mother.

On April 27, 2021, the juvenile court sustained the dependency petition on behalf of St.M., removed her from the parents' custody, and granted mother monitored visits with the infant twice a week. Mother's reunification services included a parenting program, individual counseling, and a domestic violence program.

In November 2021, mother gave birth to A.M., and the Department opened a new investigation. When questioned about her contact with father, mother asserted the allegations against him were untrue and denied there had been domestic

---

stemming from father's domestic violence. She successfully reunified with the children in that case, and the juvenile court terminated its jurisdiction in August 2017.

violence in their relationship. The Department took the newborn into protective custody.

On December 14, 2021, the Department filed a dependency petition on behalf of A.M., alleging the infant was in danger due to mother's failure to protect the older children from father's violence. On February 7, 2022, the juvenile court sustained the petition based on the findings made in the older children's dependency cases. The court removed A.M. from the parents' custody and granted mother visitation and reunification services.

The Department originally placed A.M. in a medical foster care placement due to a congenital condition that required the use of a feeding tube. In June 2022, the Department scheduled a videoconference with mother and A.M.'s doctor to discuss a procedure to have a MIC-KEY tube placed in the infant's stomach for long-term feeding. Mother refused to turn on her camera or to provide her consent for the procedure. Sometime later, she gave her consent, but only after A.M.'s doctor raised concerns about further delaying the child's treatment.

St.M. developed a strong bond with her foster parent and the caregiver's family. She was progressing with some of her milestones, but her foster parent had concerns about her development. St.M.'s doctor recommended she be evaluated for speech therapy, physical therapy, and behavioral interventions. Her foster parent had been working with the Department to obtain training and services to meet St.M.'s needs.

During this period, mother's visits with the older children were inconsistent and problematic. The children's caregivers refused to monitor visits for mother due to her persistent harassment and inappropriate behavior, including asking the children questions that insinuated they were being abused

4

in their placements. Mother's disruptive behavior continued, and the caregivers eventually requested the children's removal and placement in new foster homes.

In May 2022, the court held a combined six-month review hearing for A.M. and a 12-month review hearing for St.M. The court found mother was in compliance with her case plan but she had "not benefited from the services," as the caretakers' reports suggested she was more committed to "sabotag[ing]" the children's placements than achieving their best interests. The court continued mother's services and ordered her to undergo a psychological evaluation to "pinpoint what needs to be addressed in therapy" to facilitate reunification.

Mother's psychological evaluation identified a "problematic level of denial," particularly "surrounding the children's developmental delays" and her "false allegations against the various caretakers." The evaluator observed that mother did not "volunteer that she had made any mistakes in the history of the case," instead "present[ing] herself as a victim"; and, while mother "expressed concerns about her children being abused in foster care, she expressed no concerns about their developmental issues," despite reliable reports suggesting that each child needed developmental support. The evaluator recommended mother's visits with the children continue to be monitored, due to the "likelihood" that father was "still around and in some form of relationship" with mother.

On September 6, 2022, the juvenile court held an 18-month review hearing for St.M. and heard the Department's section 388 petition to terminate mother's reunification services with A.M. After receiving testimony from mother and the children's social worker, the court found mother was in compliance with her case

5

plan but she "still [had] a level of denial" about the children's needs and she had not demonstrated a willingness or capacity to resolve the issues that endangered her children. Based on these findings, the court terminated mother's reunification services and set a permanency planning hearing for both children.[3]

During the post-reunification period, mother had consistent visits with St.M. and A.M. that mostly went well. St.M. was enrolled in speech therapy, physical therapy, and had been assessed by an ear, nose, and throat doctor, who believed she needed a procedure to help with her hearing. Although mother was generally attentive, she did not seem to grasp St.M.'s developmental needs and, in the Department's assessment, she had not demonstrated an ability to manage and care for St.M. and her five other children during visits without supervision.

In April 2023, St.M.'s foster parent completed training for A.M.'s feeding tube, and the Department placed A.M. with his sister in the same foster home. A.M.'s feeding schedule required that he receive a prescribed amount of formula three times per day, and whatever formula he would not take by mouth had to be administered through his feeding tube. The foster parent had been attentive to this schedule, and A.M. was gaining weight in her care. The Department had discussed A.M.'s feeding schedule with mother, and mother had agreed to feed him his prescribed formula during her visits. However, mother regularly failed to feed A.M. when he refused the formula, telling the monitor she was "not going to force [A.M.] to drink something he does not like."

---

[3]    The court also terminated mother's reunification services with the older children.

6

On June 29, 2023, mother filed a section 388 petition seeking reinstatement of reunification services or unmonitored visits with all the children. In a supporting declaration she catalogued the number of parenting classes, domestic violence classes, and therapy sessions she had attended, and generally detailed what she had learned in those classes. She said she was committed to putting her children "first" and to providing them a "safe environment" free of domestic violence.

On November 20, 2023, the juvenile court held an evidentiary hearing on mother's section 388 petition. After receiving mother's testimony, the court denied the petition, finding mother had not demonstrated a significant change in circumstances as she still was unable to acknowledge the danger posed by allowing father to have unmonitored contact with the children and she was not honest about her ongoing contact with father.

On May 9, 2024, mother filed another section 388 petition requesting the children's return to her custody or, in the alternative, reinstatement of reunification services and unmonitored visitation. In a supporting declaration, mother denied she had had recent contact with father; she acknowledged domestic violence placed her children at risk; and she said she was working with her therapist to understand her children's special needs. She also reported that she had given birth to a new daughter—Sp.M.; father was not Sp.M.'s father; she had maintained custody of Sp.M.; and she had been cooperative with the social worker assigned to Sp.M.'s case.

On June 28, 2024, the court held an evidentiary hearing on mother's section 388 petition. The court denied the petition, finding that mother's acknowledgment of the children's

developmental needs at most suggested "changing"—not changed
—circumstances, and mother had failed to demonstrate the
requested modification would be in the children's best interests.
The court took special issue with mother's refusal to follow
A.M.'s prescribed feeding schedule and her apparent inability
to recognize that his dietary demands required diligent attention.

On August 23, 2024, mother filed another section 388
petition, again requesting the children's return to her custody
or, in the alternative, reinstatement of reunification services
and unmonitored visitation. This time she included documents
confirming her enrollment in a parenting class for families
with special needs children. The Department responded to the
petition with a report detailing mother's visits with St.M. and
A.M. over the past three months. The report described the visits
as consistent and "fair," but noted mother regularly experienced
"challenges with the children's behaviors." In many cases,
mother was unable to redirect the children when they threw
tantrums, often leaving the monitor with the task of calming
the children. Mother also seemed unwilling or unable to handle
basic parenting responsibilities like changing the children's
diapers during their visits. And the Department reported she
had made another false allegation to the child abuse hotline
claiming St.M. had bruises on her legs and arms.

On September 26, 2024, the court denied mother's
petition for modification with respect to St.M. and A.M after
an evidentiary hearing.[4] While the court recognized mother had

---

[4] The court granted mother's petition with respect to L.M.
and R.L., finding these older children were "differently situated"
than St.M. and A.M. in that their developmental needs presented
more modest challenges for mother. Thus, the court modified its

made an effort to change by enrolling in a new class directed at parenting special needs children, it found St.M.'s and A.M.'s needs presented "more profound challenges for mother" than she seemed capable of addressing. Mother appeared unable to handle "[b]asic things," the court noted, "such as changing a diaper," and the reports on her visits demonstrated "the programs that she would [have to] engage in [would] require so much more time and effort" than she had exhibited thus far. The court also recognized that both children had developed a close bond to the foster parent, with whom they had spent most of their lives, while they "[did not] seem to have a bond with mother." Emphasizing that the foster parent had remained a "consistent presence" and "committed to permanency," notwithstanding mother's recent attempts to sabotage the placement, the court found it would not serve the children's best interests to delay a permanent placement by granting mother further reunification services.

On January 2, 2025, the Department filed a report on its recommendation for the children's permanent plan. Although mother consistently visited with the children, she still was unable to address their behavioral issues; she frequently relied on the monitor to calm them down; and she often neglected to change the children's soiled diapers. St.M. had been placed with her foster parent since she was two months old, and A.M. was removed from mother's care when he was a newborn. The children did not look to mother when they were upset and they

previous order terminating reunification services and granted mother an additional six months to reunify with the older children.

9

often hit mother when they were frustrated during visits.  St.M. sometimes referred to mother as "teacher," while both children referred to the foster parent as "mommy."  Both children were receiving developmental care and behavioral services.  St.M. had been diagnosed with autism, and A.M.'s service providers had observed early signs of autism.  The Department recommended a permanent plan of adoption.

On February 20, 2025, the court held a hearing in advance of the scheduled permanency planning hearing.  Mother notified the court that she intended to pursue the parental bond exception to adoption, and requested the court order a bonding study, given her frequent visits with the children.[5]  The court granted the request.

On April 15, 2025, Dr. Chuck Leeb completed his bonding study, after observing a one-hour visit between mother and the children at a park five days earlier.[6]  He found a "very positive bond" between the children and mother, noting mother's "interaction with the children was positive and showed good guidance and parenting skills."  He also observed both children

---

[5]     Under the parental bond exception (also referred to as the beneficial parent-child relationship exception), the juvenile court may decline to implement the generally preferred plan of adoption if the court finds terminating parental rights would be detrimental to the child because the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the [parental] relationship."  (§ 336.26, subd. (c)(1)(B)(i); see *In re Caden C.* (2021) 11 Cal.5th 614, 630–634.)

[6]     Dr. Leeb is a licensed psychologist and a forensic and clinical specialist.

"were verbal" and at "no time did the children display any behaviors indicative of Autism Spectrum Disorder." Dr. Leeb recommended that all future visits take place at a park, as mother had told him the children "didn't like being" at the Department's office for visits and she "could not believe how happy and positive the children were behaving." He also noted that mother's behaviors and interactions with the Department might be due to her "history of verbal, physical, and sexual abuse while growing up," and recommended she receive therapy to address possible Post-Traumatic Stress Disorder and Battered Woman Syndrome.

On May 8, 2025, the juvenile court held a contested permanency planning hearing to consider the parental bond exception. Mother requested that, if the children were not returned to her custody, then the court order legal guardianship as the permanent plan. The children's counsel agreed the bonding study supported application of the parental bond exception and requested the court continue the hearing to allow guardianship papers to be prepared.

The court found the bonding study was "compelling" evidence that mother had established a "significant bond" with St.M. and A.M. In view of that bond and mother's regular visits with the children, the court found "the termination of parental rights would be detrimental to the children" and the children would "receive benefits from continuing [their] relationship" with mother, which outweighed the benefits of adoption. The court also found "it would be detrimental to the children to be returned to [mother's] physical custody" and it was "in the best interest[s] of the children to proceed through guardianship." After consulting with counsel, the court continued the

11

permanency hearing to June 3, 2025 to give the parties time to prepare the guardianship papers and to identify a monitor for mother's future visits.

On June 2, 2025, mother filed another section 388 petition, again requesting the children's return to her custody or, in the alternative, reinstatement of reunification services. She asserted the bonding study represented the "most significant positive change[ ]," as it showed she and the children "were both extremely well bonded to each other." (Boldface and underlining omitted.) She emphasized she had remained in compliance with her case plan; had participated in a special needs parenting course and individual counseling; had cut off contact with father for "almost 4 years"; and had maintained custody of her new baby "with no concerns." With respect to the children's special needs, mother asserted the Department had made false claims that the children were "non-verbal," while Dr. Leeb had found they were "quite capable of speaking." She claimed the Department "conflate[d] small things such as a child making a mess in his pants" with an inability to care for the children, and she argued the agency used incidents that could "be corrected very quickly" as a pretext to refuse to liberalize her visits. She also alleged the Department had "threatened" to file a dependency petition for her new baby and suggested the "entire" agency was "biased against her and trying to take her children."

On June 3, 2025, the juvenile court resumed the permanency hearing for St.M. and A.M.[7] After reiterating that it had sided with mother on the parental bond exception

---

[7] The court held the continued hearing on the same day it held a hearing on a permanent plan for L.M. and R.L. At that hearing, the court also addressed a section 388 petition that

12

—granting her request for "legal guardianship as opposed to adoption"—the court addressed her new section 388 petition. The court summarily denied the petition without prejudice, finding it "essentially asks for a different outcome" than what mother requested in arguing for the parental bond exception, and the petition failed to present new evidence sufficient to show that the requested relief would better serve the children's interests than the guardianship.

The juvenile court declared the children's foster parent their legal guardian and granted mother monitored visits at a mutually agreed upon location with a mutually agreed upon monitor. If mother and the guardian could not agree on a monitor, mother would be responsible for hiring a professional monitor to supervise her visits.

Mother's counsel objected to the visitation conditions, arguing mother would be unable to afford a professional monitor. The court invited mother and the Department to meet and confer on the visitation issue in advance of a final hearing on the guardianship.

On June 6, 2025, the court entered the guardianship documents and terminated jurisdiction. Mother asked to make up a missed visit with the children, but there was no further discussion of visitation. This timely appeal followed.

---

mother had filed to regain custody of the older children. The court denied the petition with respect to L.M. and R.L. as "not ripe," because the court had granted mother's earlier request to reinstate reunification services and there was, as yet, no order that "need[ed] to be changed." (See fn. 4, *ante*.) To the extent mother contends this ruling applied to her petition regarding St.M. and A.M., we reject her argument.

**DISCUSSION**

**1.** ***The Juvenile Court Reasonably Exercised***
 ***Its Discretion to Deny the Section 388 Petition***
 ***Without an Evidentiary Hearing***

Mother contends the order establishing the legal guardianship and terminating dependency jurisdiction must be set aside to allow an evidentiary hearing on her section 388 petition to reinstate reunification services with St.M. and A.M.[8] She argues the juvenile court abused its discretion when it summarily denied the petition after finding her bond with the children was sufficient to preserve the parent-child relationship under a legal guardianship. We find no error on the record presented.

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child. [Citation.] A parent need only make a prima facie showing of these elements to trigger the right to a hearing on a section 388 petition and the petition should be liberally construed in favor of granting a hearing to consider the

---

[8] Mother argues the juvenile court also erred by failing to consider whether the existing visitation order should be modified to allow unmonitored visits with the children. However, her section 388 petition did not request this relief—it requested only to "reinstate [family reunification services], and/or return [the child] to my custody." Even if the petition could be construed to include a request to modify visitation, the juvenile court reasonably exercised its discretion to deny an evidentiary hearing for the reasons discussed above.

parent's request." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806 (*Zachary G.*); accord *In re Stephanie M.* (1994) 7 Cal.4th 295, 316–317 (*Stephanie M.*); *In re Marilyn H.* (1993) 5 Cal.4th 295, 309–310 (*Marilyn H.*).)

"However, if the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition." (*Zachary G., supra,* 77 Cal.App.4th at p. 806, citing *In re Edward H.* (1996) 43 Cal.App.4th 584, 592–594 (*Edward H.*).) "The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*Zachary G.,* at p. 806.) "In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case." (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258 (*Jackson W.*); accord *In re Justice P.* (2004) 123 Cal.App.4th 181, 189 (*Justice P.*).)

The reviewing court will not disturb the decision to deny a petition for modification without an evidentiary hearing unless the juvenile court " ' "has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*In re Mary G.* (2007) 151 Cal.App.4th 184, 205; accord *In re Jasmon O.* (1994) 8 Cal.4th 398, 415 (*Jasmon O.*).)

Mother maintains the bonding study performed by Dr. Leeb constitutes the sort of "new evidence" that warrants a full hearing to consider whether an order terminating reunification services should be modified. (§ 388, subd. (a)(1); see *In re H.S.* (2010) 188 Cal.App.4th 103, 105 ["the term 'new evidence' in

section 388 means material evidence that, with due diligence, the party could not have presented at the dependency proceeding at which the order, sought to be modified or set aside, was entered"].)  The juvenile court appears to have accepted this premise (at least implicitly), and we are inclined to do the same for purposes of this appeal.  The critical issue was whether this new evidence was sufficient to prove the proposed modification would promote St.M.'s and A.M.'s best interests.  We agree with the juvenile court—it was not.

Section 388 provides:  "Any parent . . . may, upon grounds of change of circumstance or new evidence, petition . . . for a hearing to change, modify, or set aside any order of court previously made . . . . [¶] . . . [¶] *If it appears that the best interests of the child . . . may be promoted by the proposed change of order* . . . , the court shall order that a hearing be held."  (§ 388, subds. (a), (d), italics added.)  "The conditional language of section 388 makes clear that the hearing is only to be held if it appears that the best interests of the child may be promoted by the proposed change of order, which necessarily contemplates that a court need not order a hearing if this element is absent from the showing made by the petition."  (*Zachary G., supra,* 77 Cal.App.4th at pp. 806–807.)  The operative " 'if it appears' " language "refers to the initial, prehearing judicial determination of probable cause to set the section 388 petition for hearing"— not to the ultimate determination of whether to grant the petition on its merits.  (*Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 490; accord *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432–433.)

"After the termination of reunification services, the parents' interest in the care, custody and companionship

16

of the child are no longer paramount." (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) "Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child." (*Ibid.*, quoting *Marilyn H., supra,* 5 Cal.4th at p. 309; accord *Jasmon O., supra,* 8 Cal.4th at pp. 419–420.) Although section 388 is meant to provide an " 'escape mechanism' . . . to allow the court to consider new information," even "after the focus has shifted from reunification" (*Marilyn H.*, at p. 309), a court considering a petition for modification "at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*Stephanie M.*, at p. 317; accord *Marilyn H.,* at pp. 308–309; see also § 352, subd. (a) ["In considering the minor's interests" with respect to a continuance, "the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements."].)

When mother filed her section 388 petition, both children had been in foster care for over three years (St.M. had been in her foster placement for over four years); mother's reunification services had been terminated for over two and a half years; and the court had determined the permanent plan for the children should be a legal guardianship with their long-time foster parent and monitored visitation for mother. Accordingly, to meet her prima facie burden for modification, mother was required to show there was new evidence that, if credited, would prove the children's best interests would be promoted by postponing the guardianship to allow mother more time to attempt to

17

reunify with the children, notwithstanding her past failures to do so. (See *Marilyn H., supra,* 5 Cal.4th at pp. 309–310 [after reunification services are terminated, sections 366.26 and 388 rationally shift "the burden to the parent" to rebut the presumption that "continued care [with a prospective guardian or adopted parent] is in the best interest of the child" by "showing that circumstances have changed that would warrant further consideration of reunification"].)

Mother contends the bonding study, coupled with past evidence of her consistent visitation with the children and her progress in court-ordered programs, was sufficient to satisfy her prima facie burden. She argues this evidence proved reinstating reunification services would promote the children's best interests because it showed "the children were significantly bonded to [m]other, the children did not evidence significant special needs that [m]other was unable to handle, [m]other maintained her youngest child in her custody without concern, and [m]other effectively parented the children during visits." The argument overstates what the bonding study was sufficient to prove, particularly when considered in context with "the entire factual and procedural history of the case." (*Jackson W., supra,* 184 Cal.App.4th at p. 258.)

At most, the bonding study proved a beneficial bond existed between mother and the children. As Dr. Leeb recounted at the beginning of his report, he had been commissioned only to perform a "bonding study as to the parent-child relationship between mother and the minors," and his findings were limited to the determination that there was "a very positive bond between the minors and the mother" and between the two siblings. The juvenile court credited these findings

18

in determining the beneficial parent-child relationship exception applied, while reasonably rejecting mother's later contention that further delaying the guardianship to allow her more time to try to reunify with the children would be in their best interests.  As the court recognized in *Jackson W.*, the mere showing that more time "would further strengthen the parent-child bond" is an insufficient basis to prolong dependency proceedings after reunification services have been terminated, because " '[t]he presumption favoring natural parents by itself does not satisfy the best interests prong of section 388.' " (*Jackson W., supra,* 184 Cal.App.4th at p. 260, quoting *Justice P., supra,* 123 Cal.App.4th at p. 192.)  Moreover, because the juvenile court had selected a legal guardianship as the permanent plan, any interest the children had in continuing to foster this bond with mother would be preserved without prolonging their temporary placement.  (See, e.g., *Justice P.,* at p. 192 [sibling bond was not at risk and did not establish probable cause for evidentiary hearing where permanent plan provided for continued contact among siblings].)

The bonding study was insufficient to prove any other matter that could reasonably support a finding that the children's best interests would be promoted by postponing the guardianship.  To be sure, in assessing the bond mother had with the children, Dr. Leeb observed them during a one-hour visit at a park and noted that mother "interacted with both children in a positive manner"; the children "were verbal" and did not "display any behaviors indicative of Autism Spectrum Disorder"; and mother "showed good guidance and parenting skills."  However, his report also summarized an interview with mother during which she denied responsibility for allowing father

to have unmonitored contact with the older children; disputed the juvenile court's findings that her conduct had endangered the children; claimed the Department had misrepresented St.M.'s and A.M.'s developmental needs while denying her access to regional center services; and largely blamed the Department for her failure to reunify with the children. Dr. Leeb's report recounted mother's troubled upbringing and suggested that it, combined with mother's "history of physical abuse by the children's father," could be responsible for mother's inability to "balance emotions and impulses" and her "general inability to cope with life's demands." Critically, these observations were consistent with recent and ongoing reports about mother's inability to respond to the children's behavioral outbursts during visits and her failure to follow directives for feeding and toileting the children that had been prescribed for their health and welfare. And perhaps most significantly, these observations also fit with a long pattern of mother failing to appreciate the harm posed by father's domestic violence, notwithstanding years of services and counseling to address this crucial safety concern. (See *Edward H., supra,* 43 Cal.App.4th at p. 593 ["Although a juvenile court will order a hearing if a section 388 petition presents any evidence supportive of a conclusion that a hearing would promote the child's best interests [citation], it need not ignore an allegation which shows a hearing will not promote such interests."].)

In sum, Dr. Leeb's only specific finding concerned the parental bond, and his report otherwise painted (at best) a mixed picture about mother's understanding of the children's special needs and her capacity to meet those needs in a reliably safe manner, particularly with respect to the domestic violence

20

issues that brought the family within the juvenile court's jurisdiction. The "most basic" consideration in assessing whether to deny a section 388 petition is "the gravity of the problem leading to the dependency, and the reason that problem was not overcome by the final review." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530–531.) Thus, establishing probable cause for a modification will "necessarily involve" some showing that the parent can "eliminat[e] the specific factors that required placement outside the parent's home." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 463–464.) The bonding study did not furnish this necessary proof, nor did it suggest that mother was likely to overcome these risk factors were she given more time (*on top of the three to four years* the children had already been in their temporary placements) to engage in reunification services. Even crediting Dr. Leeb's observations during a one-hour visit, mother's petition was still insufficient to prove the children's best interests would be promoted by postponing the guardianship any longer. The juvenile court did not abuse its discretion in summarily denying the petition without an evidentiary hearing. (See, e.g., *In re G.B.* (2014) 227 Cal.App.4th 1147, 1160 [where "evaluation report upon which mother herself relied stated that mother continued to deny any parental role in [child's] serious injuries," section 388 petition was insufficient to establish prima facie case for modification]; *Edward H., supra,* 43 Cal.App.4th at p. 594 ["on the eve of the section 366.26 permanency planning hearing," "the children's interest in stability was the court's foremost concern and outweighed any interest in reunification"]; cf. *Kimberly F.*, at pp. 532–533 [where "the facts uniformly favor[ed] the parent," and "dirty house" that was basis for jurisdiction did not pose an "intractable" problem

for the children's best interests, it was an abuse of discretion to deny an evidentiary hearing, notwithstanding the children's interest in stability].)

## 2. *The Juvenile Court Reasonably Exercised Its Discretion to Place Conditions on Visitation under the Legal Guardianship*

The juvenile court's exit order granted mother supervised visitation with the children, provided that mother either (a) find a monitor who was agreeable to the guardian, or (b) hire a professional monitor at her expense. Mother contends this condition rendered the visitation order "illusory" because the guardian would "not allow" mother to visit the children "without a professional monitor," and mother "cannot afford" to pay a monitor. More specifically, she argues the order improperly " 'delegate[s]' " the decision to allow visitation to the guardian, while failing to acknowledge mother's financial condition. The record does not support her claim of error.

When the juvenile court orders a permanent plan of legal guardianship, it must also make an order for visitation with the parents, unless the court finds visitation would be detrimental to the child's physical or emotional well-being. (§ 366.26, subd. (c)(4)(C).) The juvenile court has "great discretion" in setting conditions for visitation, and we will not disturb the court's order unless it has exceeded the bounds of reason in exercising this discretion. (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557–1558 (*S.H.*), citing *Stephanie M., supra,* 7 Cal.4th at p. 318.)

"The court may delegate authority to the legal guardian to decide the time, place, and manner in which visitation will take place." (*In re M.R.* (2005) 132 Cal.App.4th 269, 274.) However, the court cannot delegate authority to the legal

guardian to decide "whether visitation [will] occur," and, therefore, a visitation order must provide not only that the parent "has a right to visit," but "must also specify the frequency and duration of those visits." (*Ibid.*) Here, there is no dispute that the order specified these matters—visitation under the order is to occur once a week for two hours. Nevertheless, mother argues the requirement that she mutually agree upon a monitor with the guardian, or else pay for a professional guardian herself, effectively gives the guardian veto power over whether a visit will take place because, mother says, the guardian "is not willing" to monitor mother's visits, and mother "does not have anyone else available to monitor visits without payment, which she cannot financially afford." There are at least two problems with this argument.

The principal problem is that mother's contention rests on the speculative and dubious premise that the "guardian will not allow [m]other to visit the children without a professional monitor." The record does not support this charge. On the contrary, it shows the guardian had diligently brought the children to supervised visits with mother throughout the four-year dependency proceeding; in the early months, the guardian had monitored mother's visits herself, until mother's "inappropriate behavior" made that unworkable; and mother's relatives had also monitored mother's visits, again until mother's behavior made it untenable for them to do so. Mother's past belligerent behavior supports the juvenile court's decision to condition visitation on a mutually agreed upon monitor— her history of alienating willing monitors does not prove that the guardian will refuse to agree to a new monitor when mother finds one. In view of the guardian's consistent cooperation with

23

mother's supervised visitation, any contention that the guardian would use the mutual-agreement condition as a de facto veto power is (at most) speculative. (See *Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 834, fn. 13 (*Friends*) ["speculation does not establish an abuse of discretion"].)

The second problem is mother has not furnished an adequate record to show she would be unable to pay for a professional monitor, if one were required. A juvenile court is authorized to place conditions on visitation that have financial consequences for the parent. (See *In re Chantal S.* (1996) 13 Cal.4th 196, 202–204 [juvenile court had authority to require child's therapist facilitate father's visits and to make father " 'financially responsible for these visits' "].) Although mother's counsel claimed that monitors charge around $75 per hour and that mother could not afford this rate, he offered no evidence to support either assertion. Again, absent this evidence, mother's contention is speculative and insufficient to establish an abuse of discretion.[9] (*Friends, supra,* 154 Cal.App.4th at p. 834, fn. 13.)

---

[9] Mother's reliance on section 362.8 is misplaced. That statute governs a parent's compliance with "the court-ordered case plan" during the period of "reunification" and seeks to protect a very different interest than the parent's right to visitation after efforts to reunify have failed. (§ 362.8, subd. (a); see, e.g., *S.H., supra,* 197 Cal.App.4th at pp. 1558–1559 [statutory objectives related to visitation and reunification "are no longer valid" where "reunification services have been bypassed and a permanent plan of guardianship has been ordered"].) Even in the reunification context, the statute does not shield a parent from a finding of noncompliance if the child welfare agency has provided "a comparable free service that was accessible and available to the parent" to comply with the case plan. (§ 362.8, subd. (a).) There is a free option available

24

Our review of the record confirms mother was able to visit consistently with the children and there were no issues with the guardian accommodating visits during the four years that she served as a foster parent.  In any event, even after a dependency is terminated, the juvenile court retains jurisdiction over the children as wards of the court and may modify the guardianship order if problems arise with a parent's visitation.  (See *In re K.D.* (2004) 124 Cal.App.4th 1013, 1019, citing §§ 366.3, 366.4; see also *In re Kenneth S., Jr.* (2008) 169 Cal.App.4th 1353, 1358 [when a legal guardianship is established, "if a problem develops, the parent has access to the juvenile court"]; see, e.g., *S.H., supra,* 197 Cal.App.4th at pp. 1557–1559 [juvenile court reasonably modified visitation upon appointment of successor guardian].)  Mother has not established prejudicial error on the record presented.  The juvenile court reasonably exercised its discretion to set conditions on mother's visitation under the guardianship.

---

to mother here—she simply needs to identify someone (a friend, family, community member, etc.) who is willing to monitor her visits and who is mutually acceptable to the children's guardian.

## DISPOSITION

The order is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



EGERTON, Acting P. J.

We concur:



ADAMS, J.



HANASONO, J.